**Opinion filed August 31, 2016**



In The

# Eleventh Court of Appeals

_____

## No. 11-14-00083-CR

_____

**JAMES OWEN WINCHESTER, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 119th District Court**
**Tom Green County, Texas**
**Trial Court Cause No. B-12-0120-SB**

### M E M O R A N D U M   O P I N I O N

James Owen Winchester pleaded not guilty to the murder of Kim Burton. After a trial, the jury found him guilty of murder,[1] found the enhancement paragraph to be true,[2] and assessed punishment at imprisonment for life. The trial court sentenced Appellant in accordance with the verdict. We affirm.[3]

---

[1]*See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011).

[2]PENAL § 12.32 (West 2011), § 12.42(c)(1) (West Supp. 2016).

[3]Under a docket equalization order, the Texas Supreme Court transferred this appeal from the Third Court of Appeals to the Eleventh Court of Appeals. As required under TEX. R. APP. P. 41.3, we will decide this case in accordance with the precedent of the Third Court of Appeals.

## I. *Issues Presented*

In two issues on appeal, Appellant alleges that the trial court abused its discretion when it failed to suppress or redact excerpts of two interviews that the detectives had with Appellant after Burton's murder. Although Appellant gave multiple statements during the investigation, only two of them are involved in this appeal. During those two interviews, the detectives asked Appellant questions that contained deceptive and exaggerated statements as to the evidence that they had collected that tied him to the murder. Appellant's issues on appeal relate to the inclusion of those deceptive and exaggerated statements when the interviews were admitted into evidence before the jury.

In his first issue, Appellant claims that his due process rights under both the Constitution of the United States and the constitution of the State of Texas, as well as Article 1.04 of the Texas Code of Criminal Procedure, were "violated by the State's knowing use of false and misleading evidence and its failure to correct said false and misleading evidence, which was material." In Appellant's second issue on appeal, he takes the position that the trial court erred when it overruled his objections to those portions of one particular "recorded statement by Appellant, refusing to suppress those portions by redaction and admitting the exhibit into evidence for publication in testimony of a witness for the State." Although there is no challenge to the sufficiency of the evidence, we will outline some of the testimony in order to provide context for our resolution of the issues that Appellant urges in this appeal.

## II. *Evidence at Trial*

Burton and Appellant were acquainted as a result of their involvement with illegal drugs. Appellant was, according to one of his acquaintances (Andrew Apperson), her "methamphetamine dealer," and they were "always pretty much together." According to information that Andrew gave to the police, Andrew, Appellant, and Burton had used drugs together the weekend before Burton was

2

murdered. Andrew testified that the relationship between Burton and Appellant was "very strange" and that Appellant was "extremely frustrated" because Burton always ran out of money. Appellant told Andrew that he was going to give Burton a "sleeper," which is a drug overdose.

During one interview, Appellant told the detectives that he had been at Burton's house on the evening of the murder and that Burton was there at the time. Appellant said that he had gone to Burton's house that evening to get items to sell to get money for drugs. On the night of the murder, Erika Anne Heffner, Burton's daughter, called Burton around midnight to alert her to an impending, bad storm. Two days later, Heffner went to her mother's house and noticed that her pickup was missing. Heffner went into the house and noticed a "rampant" smell; she found her deceased mother on the couch with a blanket over her.

Burton had blood on her clothes and parts of her body. There was also blood on the blanket, couch, walls, furniture, pictures, carpet, ceiling fan, and in other places. Burton's partially decomposed body showed defensive wounds. She had multiple bruises and a fractured skull, wrist, and thumb, and her right ear was gone. Burton lived for some time before she ultimately died from a blunt force head injury. The police recovered a sledgehammer at the scene. The only DNA found on the sledgehammer matched Burton's DNA; the coroner testified that the sledgehammer was used to murder Burton.

Travis Bolwerk, another acquaintance of Appellant, testified that Appellant came to his apartment on the night of the murder; Appellant had blood on his face and jersey. Appellant told Bolwerk that he had been in a fight; he used Bolwerk's bathroom to wash off the blood.

Approximately three days after Burton's murder, the police arrested Appellant on an outstanding arrest warrant for probation violations. At that time, Appellant had Burton's phone and was wearing the same clothes that he had worn on the night

of the murder. The evidence indicated that Appellant and an acquaintance, Anthony Apperson (Tony), had sold some of Burton's property to get drugs. Appellant also had Burton's pickup and had given it to Tony, who in turn rented the pickup to another person for drugs. Bloodstains found in the pickup matched Burton's DNA.

While in custody, and after Appellant had been read his *Miranda*[4] warnings by a detective from the San Angelo Police Department, Appellant waived his rights and agreed to an interview. Detective Brian Elkins conducted the interview. Detective Elkins testified about how he builds a rapport with a suspect and said that, in the process, he may exaggerate information in order to get the truth from that person. Appellant initially denied that he knew about Burton's death, and he later denied that he had murdered her. He eventually told detectives that he was at the house at the time of the murder, but he claimed that another man, Dwayne Chadwick, who had been dropped off at the house by a third man, had argued with Burton and that Chadwick had hit her in the head with a sledgehammer and killed her. Appellant said that Chadwick then forced him to take Chadwick to a nearby convenience store. After Chadwick got out of the pickup, Appellant left. The detectives were never able to determine that Chadwick was involved; they could not place him at the scene, and the case against Chadwick was dismissed.

On October 4, 2011, more than three years after the murder, Detective William Mickey Jones of the San Angelo Police Department and Investigator Paul Dyer, with the district attorney's office, interviewed Appellant in Joplin, Missouri. They advised Appellant of his *Miranda* rights, and Appellant waived those rights. In this interview, the detectives used the same interview techniques as Detective Elkins and confronted Appellant with his earlier statements about Chadwick. They exaggerated the information that had been collected and told Appellant that they had certain hair, DNA, and blood evidence that proved he had

---

[4]*Miranda v. Arizona*, 384 U.S. 436 (1966).

murdered Burton; they asked him to explain the evidence and tell the truth. Appellant responded that he did not kill Burton. Appellant complains that the questions posed by the detectives in this interview, as in the first one, included false or misleading evidence that was left uncorrected by the State and that those excerpts either should have been redacted or not admitted.

### III. *Standard of Review*

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Ramos v. State*, 245 S.W.3d 410, 417–18 (Tex. Crim. App. 2008); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g). The trial court's ruling will be upheld on appeal if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Ramos*, 245 S.W.3d at 418. We will reverse a trial court's ruling only if it is outside the "zone of reasonable disagreement." *Montgomery*, 810 S.W.2d at 391.

### IV. *Discussion and Analysis*

#### A. *Appellant waived his complaint in his first issue on appeal as it relates to the first interview.*

In the trial court, Appellant's only objection to the first interview was that it was not voluntarily made. However, on appeal, Appellant complains that his due process rights were violated when the State presented false and misleading evidence that the State failed to correct. The State argued that Appellant failed to preserve this issue for appeal as to the first interview. As we explain below, we agree with the State that Appellant failed to preserve the issue for appeal as to the first interview.

In order to preserve a complaint for appellate review, a party must present the trial court with a timely request, objection, or motion stating the specific grounds for the desired ruling, if those grounds are not apparent from the context, and must obtain a ruling. TEX. R. APP. P. 33.1(a); *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002). Failure to object when there was an opportunity to do so generally waives error. *Burt v. State*, 396 S.W.3d 574, 577–78 (Tex. Crim. App.

2013). A party must continue to object each time the objectionable evidence is offered. *Fuentes v. State*, 991 S.W.2d 267, 273 (Tex. Crim. App. 1999); *Ethington v. State*, 819 S.W.2d 854, 858–59 (Tex. Crim. App. 1991). In addition, we may only review those issues on appeal that comport with the complaint made before the trial court. *See* TEX. R. APP. P. 33.1(a); *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009); *Wilson*, 71 S.W.3d at 349 (citing *Thomas v. State*, 723 S.W.2d 696, 700 (Tex. Crim. App. 1986)). To determine "whether the complaint on appeal comports with the complaint made at trial," we must "consider the context in which the complaint was made and the parties' shared understanding at that time." *Pena*, 285 S.W.3d at 464.

As to the first interview, the complaint at trial was that Appellant's statements were not voluntarily made. Defense counsel did not complain that the questions posed by the detectives contained allegedly false or misleading evidence. Because a complaint on appeal must comport with the objection made at trial and because that did not happen in this case, Appellant failed to preserve the complaint for appellate review. *See* TEX. R. APP. P. 33.1(a); *Pena*, 285 S.W.3d at 464; *Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008); *Wilson*, 71 S.W.3d at 349. We overrule Appellant's first issue on appeal as it pertains to the first interview.

*B. The trial court did not abuse its discretion when it admitted the excerpts from the interview conducted in Joplin.*

In his first and second issues on appeal, Appellant asserts that portions of the Joplin interview were inadmissible because the questions asked by the detectives included false and misleading evidence and the State did not correct the errors. But Appellant makes no argument on appeal that the Joplin interview was not voluntary. During the Joplin interview, the detectives made statements and asked questions in which they exaggerated the evidence that they had. Appellant argues that the trial court abused its discretion when it failed to redact those portions before it admitted

6

the exhibit. In response, the State argues that it is perfectly acceptable for police to use interview techniques that involve exaggeration, deception, and confrontation to elicit the truth from a witness or suspect. We agree with the State that the trial court did not abuse its discretion when it admitted the excerpts of the Joplin interview because the State did not fabricate or present false or misleading evidence.

Police may use deception and "trickery" as interview techniques. *Wilson v. State*, 311 S.W.3d 452, 461–62 (Tex. Crim. App. 2010). "[V]erbal trickery, deception and 'outright lies concerning the existence of evidence' are acceptable interrogation strategies, but not the use of 'false, incriminating documents.'" *Id.* at 462 (quoting FRED E. INBAU ET AL., CRIMINAL INTERROGATION AND CONFESSIONS 217 (4th ed. 2001)); *see also Oursbourn v. State*, 259 S.W.3d 159, 182 (Tex. Crim. App. 2008) (lying about the state of the evidence is not "overreaching" that implicates due process, as long as the deception or subterfuge used is not one likely to produce an untrue statement). "Trickery or deception does not make a statement involuntary unless the method was calculated to produce an untruthful confession or was offensive to due process." *Creager v. State*, 952 S.W.2d 852, 856 (Tex. Crim. App. 1997). A "[m]isrepresentation[] made by the police to a suspect during an interrogation is a relevant factor in assessing whether the suspect's confession was voluntary, but it is insufficient to render an otherwise voluntary confession inadmissible." *Green v. State*, 934 S.W.2d 92, 99 (Tex. Crim. App. 1996) (citing *Frazier v. Cupp*, 394 U.S. 731, 739 (1969)). We review this issue under the "totality of the circumstances" and will not hold that an otherwise voluntary confession is inadmissible just because police misrepresented facts during an interrogation. *Frazier*, 394 U.S. at 739.

Appellant complained about the following questions and rhetoric that Detective Jones posed to him in the Joplin interview: "Her blood is on you. We know where you were standing when *you* swung the hammer. We know, James, . . .

7

we know, ok? . . . We know the facts. We know what happened in there." Then, Detective Jones queried, "Science tells me what happened, ok? But science can't tell me why it happened." Detective Jones then said, "Her DNA is in Travis's sink. Her hair is in Travis's sink. . . . This was hair that came out because somebody hit her in the head with a hammer. We can prove that." Appellant responded, "I did not kill her man."

A comment made by Investigator Dyer was as follows: "The blood in the sink, along with the hair, her blood on your shirt, not only on the out . . . you had two shirts on: you had a jersey, kind of a knit-type jersey, and then a white T-shirt on under it." Investigator Dyer continued, "Not only is there blood on the outside shirt, the blood hit the shirt with such force that it went through to the white T-shirt." Later, Detective Jones said that there was "a mountain of evidence that tells us— that really paints a clear picture of what happened in there." Then Investigator Dyer asked, "How does that much blood get on your hands if you are not swinging the hammer? How? It's just physically impossible." Appellant later responded, "I did not do that to her. I would not do that. . . . I did not do that." He later reiterated, "I didn't kill her."

The jury heard the evidence from Detective Elkins and Detective Jones about their investigation and the deception that they had employed as interview techniques. The detectives explained to the jury in detail how they exaggerated each statement that related to the kind and amount of evidence that they had collected in their investigation. But they did not fabricate or manufacture any evidence. They used deception and exaggeration in an attempt to get Appellant to tell them the truth about what had happened. We agree with the State that, rather than being misled as to the facts, the jury was informed as to investigative techniques.

This is not a case that involves uncorrected perjury or the failure to disclose evidence favorable to an accused. *See, e.g.*, *Ex parte Ghahremani*, 332 S.W.3d 470,

477–78 (Tex. Crim. App. 2011). The jury heard forensic evidence about the results of the lab tests on hair, DNA, and blood. The jury heard that Appellant received *Miranda* warnings prior to the Joplin interview and that he waived his rights and chose to speak to the detectives. The jury did not hear that the detectives had fabricated documents, fingerprints, DNA reports, or hair test results. In addition, Appellant never confessed to the crime; he said, "I did not kill her man," and "I didn't kill her." Appellant's argument that the interview questions amounted to false and misleading evidence is unpersuasive because there was no fabricated evidence and because Appellant never confessed that he killed Burton but, instead, claimed that someone else did. After a review of the record and given the totality of the circumstances, we hold that the trial court did not abuse its discretion when it admitted the Joplin interview. Insofar as Appellant's second issue might embrace the initial interview, or in the event that we are in error as to the preservation of matters regarding the first interview, we also hold that the trial court did not abuse its discretion when it admitted the excerpts of the first interview. We overrule Appellant's first and second issues on appeal.

## V. *This Court's Ruling*

We affirm the judgment of the trial court.

MIKE WILLSON

JUSTICE

August 31, 2016

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.

9